AO 91 (REV.3/92) Criminal Complaint  AUSA Mark T. Karner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

**FILED**
AUG 0 8 2008

MAGISTRATE JUDGE P. MICHAEL MAHONEY
United States District Court

UNITED STATES OF AMERICA

v.

DARIUS R. MCGEE

CRIMINAL COMPLAINT

CASE NUMBER:

08CR50037

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about May 29, 2008, at Freeport, in the Northern District of Illinois, Western Division, DARIUS R. MCGEE, defendant herein:

(Track Statutory Language of Offense)

> knowingly and intentionally distributed a controlled substance, namely, approximately 42.1 grams of mixtures containing cocaine base, a Schedule II Narcotic Drug Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1). I further state that I am an ATF Special Agent and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT.**

Continued on the attached sheet and made a part hereof:   x  Yes  ___ No

Signature of Complainant
Sarah Tucker, Special Agent, ATF

Sworn to before me and subscribed in my presence,

August 8, 2008                         at Rockford, Illinois
Date                                    City and State

P. Michael Mahoney, U.S. Magistrate Judge
Name & Title of Judicial Officer        Signature of Judicial Officer

| | |
|---|---|
| NORTHERN DISTRICT OF ILLINOIS | ) |
| | ) ss. |
| WESTERN DIVISION | ) |

## AFFIDAVIT

I, SARAH A. TUCKER, being duly sworn on oath state:

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have worked as an ATF Special Agent for approximately 5 years. My duties include investigating violations of Title 21, United States Code, Section 841, which makes it illegal to distribute and possess with intent to distribute controlled substances, including cocaine and cocaine base. I have been involved in numerous investigations of drug trafficking and the illegal possession of firearms, and have worked closely with state and local police agencies investigating drug and firearms-related offenses. In addition to my experience as an ATF Special Agent, I have received training in the enforcement of drug and firearms-related laws from the ATF.

I have been assigned to assist the Freeport Police Department and the Illinois State Police in an investigation into cocaine base trafficking by Darius R. McGee, also known as "Chavez" (hereinafter "McGee"). Since this affidavit is being submitted for the limited purposes of establishing probable cause that McGee committed the offense of distribution of cocaine base, in violation of Title 21, United States Code, Section 841(a)(1), I have not included each and every fact known to me concerning this investigation. This affidavit is based upon information obtained by me personally and information provided to me by other law enforcement agents, officers, confidential sources of information and others identified herein.

1

On April 29, 2008, Freeport Police Department Narcotics Unit Detective Aaron Dykema, Freeport Police Detective Robyn Stovall, and I met with a confidential source (hereinafter "CS"). The CS told us that during the past twelve months, the CS purchased multiple ounces of crack cocaine from McGee on a number of occasions. The CS learned that McGee purchases cocaine and/or crack cocaine from an unknown source in Chicago and then distributes it throughout the Freeport Illinois area. According to the CS, McGee often distributes cocaine while armed with a firearm. The CS also provided us with McGee's cellular telephone number.

On Monday, May 26, 2008, Detective Dykema directed the CS call McGee. The CS made an unrecorded call to McGee and informed McGee that the CS wanted to purchase a quantity of three ounces of crack cocaine on the following day.

On May 27, 2008, the CS informed us that the CS had another unrecorded telephone conversation with McGee. During this conversation, McGee said that he only had powder cocaine available and would probably have crack cocaine available on the following day. During this conversation, McGee gave the CS a second cellular telephone number for the CS to contact him. According to the CS, McGee and an unknown male arrived at the home of the CS later that evening and offered to sell the CS three ounces of powder cocaine. During this meeting, McGee promised to show the CS how to "cook" the cocaine into crack cocaine. The CS told McGee that the CS was not interested in purchasing cocaine at that time.

On Wednesday, May 28, 2008, at approximately 4:43 p.m., the CS made a recorded phone call to McGee in the presence of Det. Dykema and I. The CS asked McGee if he had the "three" ready, referring to three ounces of crack cocaine. McGee said that he was waiting on his "guy" and would be ready in 20-30 minutes. After this conversation, the CS briefly met with

2

McGee briefly at 1303 S. Float Street and had three additional recorded phone conversations with him. We ultimately decided to arrange for the CS to buy crack cocaine on the following day.

On Thursday, May 29, 2008, at approximately 4:46 p.m., the CS made a recorded phone call to McGee in the presence of Det. Dykema and I. McGee told the CS that he had just returned to town and asked the CS to come to his mother's house at 1303 South Float Street, Freeport, Illinois. Following this call, Detective Dykema and I searched the CS and the CS's vehicle and found no contraband. We then equipped the CS with a covert audio eavesdropping device and provided the CS with $1500.00 in prerecorded government funds to purchase crack cocaine from McGee. Investigating agents followed the CS to 1303 S. Float Street and conducted surveillance on the CS during the CS's brief meeting with McGee inside the CS's car. During this meeting, the CS handed McGee $1000 in cash toward the purchase of crack cocaine. McGee took the money and left the car while telling the CS that he was going to obtain the crack from his supplier.

Over the course of the next few hours, investigating agents kept the CS under constant surveillance while the CS had periodic recorded telephone conversations and meetings with McGee at 1303 S. Float Street. McGee repeatedly told the CS that he was waiting on his guy to "cook" it up, referring to the process involved in converting powder cocaine to crack cocaine. Eventually, McGee agreed to meet the CS back at 1303 S. Float Street to conduct the narcotic transaction. Prior to this meeting, Detective Dykema and I searched the CS and the CS's vehicle and found no contraband. At approximately 9:21 p.m. the recording equipment was reactivated and we followed the CS as the CS returned to 1303 S. Float Street at approximately 9:30 p.m.

McGee entered the CS's vehicle at approximately 9:58 p.m. Once inside the vehicle, McGee handed the CS a plastic baggie containing crack cocaine. McGee told the CS that it was seven grams short and that the crack cocaine was still warm because his guy just finished cooking it up. McGee told the CS that he will have the remainder for him/her later in the evening.

Following this meeting, the CS turned over the bag containing crack cocaine to investigating agents. This bag of crack cocaine was submitted to the Illinois State Police Crime Laboratory in Rockford Illinois. A forensic chemist employed by the crime laboratory analyzed the contents of this bag and determined that it contained 42.1 grams of cocaine base.

On Friday, May 30, 2008, Detective Dykema and I met with the CS. Prior to this meeting, Detective Dykema instructed the CS to call McGee to complain about receiving 13 grams less than the agreed upon quantity during the exchange that occurred on the previous evening. The CS made an unrecorded call to McGee and complained about being "shorted." McGee acknowledged the shortage and promised to have the rest of the cocaine ready for the CS. At approximately 5:16 p.m., the CS called McGee. An unknown male answered the phone indicating that he was holding McGee's phone and that McGee was at his mother's house.

Investigating agents then made arrangements for the CS to meet with McGee. I searched the CS's vehicle while Det. Dykema searched the CS, with no contraband being found in either location. Electronic recording devices were activated and the CS was instructed to drive directly to 1303 S. Float St. and meet with McGee. Detective Dykema and I followed the CS directly to the area of 1303 S. Float Street and conducted surveillance on the CS's vehicle. The CS met with McGee for less than five minutes. During this meeting, McGee said that he had just sent his girlfriend to get the crack cocaine and that she should return with it in ten to fifteen minutes.

4

McGee explained that during the previous night he had to recook the cocaine because his guy had "screwed it up." McGee also questioned the CS about whether the CS was armed with a firearm the previous evening. McGee admitted that he had been in possession of a firearm because he was scared. This meeting ended when the CS told McGee that the CS couldn't wait around longer and would meet up with McGee another day to collect the crack cocaine the CS was owed.

On June 23, 2008, at approximately 3:36 p.m., the CS called Det. Dykema and informed him that the CS had received four missed calls from McGee. At approximately 5:26 p.m., the CS called Det. Dykema and requested to meet with him. The CS said that McGee had showed up at the CS's residence unannounced and left a plastic bag containing crack cocaine on the kitchen counter for the CS to sell. According to the CS, McGee was armed with a firearm in the front waistband area of his pants. The CS told Det. Dykema McGee had arrived at the CS's house in a vehicle with decals on it with a black female driver. At approximately 5:59 p.m., the CS called Det. Dykema and said that they needed to meet as soon as possible. At 6:22 p.m., Detective Dykema and Detective Stovall met with the CS. During this meeting, the CS said that McGee had returned to the CS's residence a second time, in the same vehicle and with the same driver. McGee entered the CS's residence without knocking and placed a second and much larger bag of suspected crack cocaine on the kitchen counter. McGee told the CS that he knew that the CS needed to make some money and further instructed the CS that the CS would owe McGee "3", meaning $3000.00 by the end of the week. According to the CS, McGee had the same handgun in his waistband during this meeting. The CS turned over one plastic baggie corner which

5

contained approximately 13.1 grams of suspected crack cocaine and one plastic sandwich baggie which contained approximately 99 grams of suspected crack cocaine to Detective Dykema.

Following this meeting, both bags of crack cocaine were submitted to the Illinois State Police Crime Laboratory in Rockford Illinois. A forensic chemist employed by the crime laboratory analyzed the contents of both bags and determined that one bag contained 12.1 grams of cocaine base and the other bag contained 95.8 grams of cocaine base.

On Wednesday, June 25, 2008, Detective Dykema and I met with the CS for the purpose of making a partial payment to McGee. At approximately 4:50 p.m., we directed the CS to make a recorded phone call to McGee. During the conversation, the CS asked McGee if he was at his mother's house and McGee said that he was. The CS told McGee that he would be over in about ten minutes. I searched the CS's vehicle while Det. Dykema searched the CS for contraband with none being recovered. The CS was then provided with $1000.00 in prerecorded funds to be utilized as partial payment to McGee for the previously "fronted" narcotics. The CS was also equipped with a covert eavesdropping device. Investigating agents then followed the CS directly to the area of 1303 S. Float Street. Detective Dykema and I conducted surveillance on the CS's meeting with McGee.

I listened to the recording of the meeting between McGee and the CS. During this meeting, the CS told McGee that his scale must be off because the "fronted" narcotics weighed only 99 grams. McGee attempted to convince the CS that he had actually delivered 130 grams of cocaine to the CS. He claimed that he was certain of the weight because he had started with 150 grams and kept 20 grams for himself. McGee told the CS that he was going to charge the CS $3,000 this time, but would only charge him $2700 for future purchases. McGee said that his

man was starting to "hit him right" and if he moved the stuff quick "it will be on." McGee also told the CS that he has a lot of stuff bagged up and could hit the CS up with it later. The CS told McGee that the CS didn't want any additional narcotics. The CS questioned McGee about coming to the CS's house with a firearm displayed on the previous Monday. McGee told the CS that he comes around "packing" sometimes, especially when "Bubba" was around, but if he did have a firearm no one would have seen it. McGee insisted that he did not have a firearm displayed while inside the CS's residence.

On June 27, 2008, Det. Dykema and I met with the CS in this investigation for the purpose of making a second controlled payment of pre-recorded funds to McGee for narcotics which had previously been "fronted" to the CS on 06/23/08. At approximately 3:55 p.m., the CS was directed to make a recorded phone call to McGee. During the conversation, the CS told McGee that the CS wanted to drop some stuff off for McGee. McGee said that he was at the house. The CS said that the CS was on the way. Detective Dykema and I searched the CS's vehicle for contraband with none being recovered. Additionally, Detective Dykema searched the CS's person with negative results. I provided the CS with a covert eavesdropping device and provided the CS with $800.00 in prerecorded funds. We instructed the CS was to drive directly to 1303 S. Float St. and meet with McGee. Det. Dykema and I followed the CS directly to the area of 1303 S. Float Street and conducted surveillance on the CS. The CS remained at 1303 S. Float St. for a few minutes before leaving the location and driving to a predetermined location to meet with investigating agents. During this meeting, Detective Dykema searched the CS and the CS's vehicle for contraband/pre-recorded funds and found nothing.

I reviewed the recorded conversation between the CS and McGee. During this meeting, the CS told McGee that the CS had an additional $800.00 for him. McGee said that he told his guy that the CS was "moving some shit" so this payment should keep him calm. McGee said that he will tell his guy that he needs a couple more days to get the rest of the money.

On July 1, 2008, Detective Dykema and I met with the CS in this investigation for the purpose of making a third and final controlled payment of pre-recorded funds to McGee for narcotics which had previously been "fronted" to the CS. The CS told Det. Dykema and me that McGee had stopped by the CS's residence on June 28 and June 30. The CS told us that McGee had also called the CS's cellular phone approximately three times. At approximately 4:03 p.m., we directed the CS to make a recorded phone call to McGee. During the conversation, the CS asked McGee how much the CS still owed McGee. McGee replied "12", meaning $1200. The CS said that the CS would be at McGee's mother's house in approximately ten minutes. Det. Dykema and I searched the CS's vehicle for contraband with none being recovered. Additionally, Det. Dykema searched the CS's person with negative results. I provided the CS with a covert eavesdropping device and the CS was provided with $1200.00 in pre-recorded funds to be utilized as a final payment to McGee. Additionally, Det. Stovall equipped the CS's vehicle with a covert video recording device. The CS was then instructed to drive directly to 1303 S. Float St. and meet with McGee. Det. Dykema, Det. Stovall, and I followed the CS directly to the area of 1303 S. Float Street and conducted surveillance on the CS. While the CS waited at 1303 South Float Street, a marked police unit, which was not part of the operation, arrived in the immediate area. Shortly thereafter, the CS contacted Det. Dykema and relayed that McGee had driven by the residence and requested the CS to follow him. After waiting for a

period of time, the CS drove around the block and met briefly in the street with McGee who relayed the presence of the police car in the area. The CS then contacted Det. Dykema and was followed out of the area to a predetermined meet location for a debriefing. The CS and his/her vehicle were again searched for contraband with none being found.

During the recorded conversation between McGee and the CS, which I had an opportunity to review, McGee mentioned the police car that was in the area and told the CS, "I swear to God I will kill you if you try and set me up." McGee then told the CS to call him. At approximately 5:00 p.m., the CS called McGee. During the conversation, McGee agreed to meet the CS at the Boco gas station located at 511 E. Stephenson in Freeport to collect the remainder of his payment. Det. Stovall and I then reactivated the audio/video recording equipment and directed the CS to travel directly to the Boco gas station and pay McGee the final $1200.00 owed. Illinois State Police ("ISP") Sgt. Walt Valentine followed the CS directly to the Boco gas station and at approximately 5:19 p.m., ISP M/Sgt. Fay Meiborg reported via radio transmission that the CS had arrived at the gas station and that McGee was already at the location as well. Sgt. Meiborg saw McGee enter the CS's vehicle. After a few minutes, the CS left this location and was followed by Sgt. Valentine and Det. Dykema to a predetermined meet location for debriefing. At this meeting, Detective Dykema searched the CS and his/her vehicle for contraband/pre-recorded funds with none being found.

During the recorded meeting, which I had an opportunity to review, McGee said he saw a police officer with binoculars on his street and was getting scared. McGee also described two surveillance vehicles that he observed in the area of Carroll St. and told the CS that he thought that they might be watching someone named "Tavares" down the street. The CS can be heard

giving McGee the $1200.00 in pre-recorded funds and asked McGee to count the money. McGee told the CS that maybe the next time it will only cost him/her $2500. The CS said that the CS did not want any additional narcotics because it was too expensive and the CS didn't make any money on this deal. The CS told McGee that the CS might have something else that McGee wanted. McGee asked what kind. The CS said a "45" -- meaning a .45 caliber handgun. McGee said that he wanted it and asked if it is the one that the CS owned. The CS told McGee that the CS's gun was registered so that the CS was going to get McGee a used .45 with a "ten clip." The CS asked McGee if he wanted it and McGee said yes.

Based upon a review of McGee's criminal history received from the National Crime Information Center, I know that McGee has at least three prior felony convictions. In 2003, McGee was convicted of manufacture/delivery controlled substance in Stephenson County, Illinois and sentenced to three years in the Illinois Department of Corrections. In 2004, McGee was convicted of aggravated fleeing police in Stephenson County, Illinois and sentenced to twenty-four months of special probation. In 2005, McGee was convicted of manufacture/delivery controlled substance in Stephenson County, Illinois and sentenced to 7 years in the Illinois Department of Corrections. McGee was released on parole in August 2007 and is currently on parole until August 2009.

Based upon my training and experience, and based upon the foregoing information set forth in this affidavit, I believe there is probable cause to conclude that Darius R. McGee committed the offense of distribution of a controlled substance, namely cocaine base, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

The information contained in this affidavit is true and correct to the best of my knowledge and belief.

*[signature: Sarah A. Tucker]*
SARAH A. TUCKER
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

SUBSCRIBED AND SWORN TO BEFORE ME THIS 8th DAY OF AUGUST, 2008

*[signature: P. Michael Mahoney]*
P. MICHAEL MAHONEY
United States Magistrate Judge

Northern District of Illinois

11